Filed 5/2/14  In re M.R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.R., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>R.R. et al.,<br><br>      Defendants and Appellants. | G049171<br><br>(Super. Ct. No. DP021514)<br><br>O P I N I O N |

        Appeal from a postjudgment order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

        Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant R.R.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant Timothy R.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*         \*         \*

Approximately one year ago, we denied father Timothy R.'s petition for writ of mandate, which challenged the juvenile court's decision to terminate reunification services and set a hearing under Welfare and Institutions Code section 366.26[1] in the dependency case of his son, M.R.  (*Timothy R. v. Superior Court* (May 22, 2013, G048078) [nonpub. opn.] (*Timothy*).)  At the subsequent section 366.26 hearing, the court established adoption as the permanent plan for son and terminated the parental rights of father and mother, R.R.  Father and mother appeal the court's order, contending that the benefit exception (§ 366.26, subd. (c)(1)(B)(i) applies to father's relationship with son.[2]  We affirm, as the court did not abuse its discretion in finding this exception inapplicable.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] Mother joins in father's briefs, noting that if the court erred in terminating father's parental rights, it also necessarily erred by terminating mother's parental rights. (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110.)  Mother does not argue that her relationship with son independently qualifies for the benefit exception.  We therefore focus on father's relationship with son and refer to father's arguments and contentions in the remainder of this opinion.

FACTS

Son (now five years old, four at the time of the § 366.26 hearing) "is a very intelligent little boy with many likable characteristics. [He] is a good natured little boy with a big heart. [He] enjoys spending time with his family and now his nephew. [He] loves to be outside. [He] loves one-on-one attention from adults and [he] is very outgoing socially for his age. It has been apparent that [son] is able to acclimate very well to different situations as seen over the past few years of his life. [He] has a special personality and . . . is active and energetic."

"Since April 2012, son has been placed with his adult sister. Son adapted well to his placement." (*Timothy*, *supra*, G048078.) Son's adult sister and her fiancé are now prospective adoptive parents, upon whom the Orange County Social Services Agency (SSA) conducted a preliminary assessment. "The prospective adoptive parents and the prospective adoptive mother's young son are truly attached to the child. They desire to adopt the child because he cannot be cared for by his birth parents. They love him and desire to provide him with a safe, secure and nurturing family environment." "The prospective adoptive mother has had a relationship with the child since his birth. She truly loves and cares for the child and wants to provide him with a childhood that she did not have. The prospective adoptive father has had a relationship with the child for a year. He has quickly become a loving, affectionate and positive father figure to the prospective adoptive child. The prospective adoptive family's son, who is five years of age, and the prospective adoptive child have developed a good sibling relationship with each other." Son "appears extremely bonded to the prospective adoptive parents. He seeks out both adoptive parents for attention, assistance and affection."

As we explained in our prior opinion, substantial evidence supported the court's decision not to return son to the custody of father at the 18-month review hearing and to terminate father's reunification services. "Father is a recovering heroin addict

3

with anger management problems and a criminal history. Father failed to comply with [SSA's] request that he limit pain medication to non-narcotic drugs. Instead, he lied to the methadone clinic to obtain his pain medication of choice and discarded pain management specialists until he found one willing to prescribe his preferred pain medication (methadone). Father failed to demonstrate through therapy or his actions during the dependency case that he would keep his anger under control or that he would cooperate with SSA to ensure the safety of son were son to be returned to father." (*Timothy*, *supra*, G048078.) The court denied father's subsequent section 388 petition to return son to his care based on changed circumstances. Father does not appeal this ruling.

We focus the remainder of our statement of facts to evidence concerning the relationship between father and son. The relevant evidence consists both of information presented in SSA reports and testimony provided at the section 366.26 hearing.

*SSA Reports*

In a June 27, 2013 report, SSA recommended that the court terminate parental rights and establish a permanent plan of adoption The report noted, "The father has had supervised visits throughout the duration of the case. The father has not had any unsupervised time. The father throughout the case has maintained regular visits with his son. The father has had some missed visits due to incarceration or illness." Father actively played with and cared for son at the visits. An earlier report noted that father's visitation schedule consisted of two, 3-hour visits per week.

In a September 10 addendum report, SSA reiterated its recommendation from the prior report, i.e., that the court terminate parental rights and establish a permanent plan of adoption. "Since the last hearing the father has been attending his visitation with his son. The Orange County Prevention Center has continued to relay that

4

the visits with the father and the child go well.  The father brings food and snacks to the visits.  They play together and watch movies.  The father assists the child to the bathroom."  At an August 8, 2013 visit, father "was on time and greeted the child with hugs."  Father and son played together, ate together, watched a movie together, and read together.

As father and son were leaving the building after the August 8 visit, an incident occurred at the elevator.  A security guard pulled son into the elevator as the doors started to close.  "Immediately the father screamed 'ASSHOLE' as the elevator doors were closing.  The father started screaming at the staff that '[the guard] had no right to touch my son' . . . .  The father was aggressive with the staff and told them that they better tell the security guard this or he will.  The staff was able to calm the father down and then he apologized to the staff and told them that he let his emotions get the best of him.  He then left the Center."

*Father's Testimony*

"This whole thing has been very, very hard on me. . . .  [M]e and my son were together every single day 24/7 for two years, the first two years of his life.  And we were extremely bonded.  And I love him very much.  And this whole thing has been very, very hard on me.  [¶]  I feel like I've lost my heart.  And it's been going on for some time now, and for the first year and a half or so, I wasn't handling my depression and anxiety, frustration, I wasn't handling them very good.  And it was hurting me, and it was hurting my son."

"I am his father.  Fatherly love to his son is something that I can't describe, something special I have for him.  There's nobody . . . that could love him like I do."  "I have my life experiences.  And I'm a survivor, and I [have] been through a lot in my life.  And I have so many things to teach him, about life, so he has a head start."

5

As to the elevator incident, father was upset because the elevator doors almost closed on son because the guard pulled son back into the elevator. Son was having trouble saying good bye to father, who was standing outside of the elevator. Father promptly apologized to the security guard after talking with the visitation monitor.

In his six hours per week with son, father helped son with his social skills ("he's really shy around people he doesn't know"), instructed him on following rules (e.g., stay out of the locked cabinet in the visitation room even though you know how to unlock it), and disciplined son (e.g., put him in a time out because "he was just acting up and wasn't listening").

*Testimony of Monitors*

A monitor for approximately 30 of father's visits with son testified to "a general overview" of father's visits: "[T]he father for the most part always arrives on time, so the father's already in the visitation area, and . . . when [son] comes, father usually just waits in the hallway, and [son] just comes running, oftentimes shouts 'Daddy.' Father kneels down, child runs up to him, hugs him, hug each other, kiss each other, and they go back into the visitation room and pretty much the father usually brings him a new movie. He usually tells him, oh, I bought him a new Disney movie. I bought him some Legos. [Son] likes to play a lot with race car track toys. They build Legos together. They typically watch movies. He brings him snacks, food, drinks. And at the end of the visit, they usually just hug and they kiss each other, and they usually say, 'I love you' when the visit ends." "Periodically sometimes the child will say, 'I love you, Daddy,' and just hug him." Son is excited when he plays with father. In the two months preceding the hearing, father and son have had longer parting moments, and son would sometimes say, "I don't want to go, I want to stay." During two or three visits, father attempted to teach son about counting and shapes, but for the most part they played together. Father is attentive to son's need for food or to use the restroom. Son responds

6

to father's instructions (e.g., it's time to eat). Father has disciplined son by telling him he cannot misbehave and giving son a time out from playing.

A second monitor observed, "They are talking, they laugh, they play together. They are always playing together." "[A]t the end of the visit, they hug each other, give the other a kiss. There's times when it does take a little while for [son] to leave, just because he wants to stay longer with the dad." Son is more affectionate with father than with the monitors. It looks like a "father-child relationship" to the monitor. "They talk to each other. They are laughing. They are constantly hugging. The father is kissing the son." The second monitor did not see anything inappropriate about father's reaction to the elevator incident on August 8. At a July 2013 visitation, father was not happy about being in a room with multiple other families. Father was "a little loud" in relaying his request for a private room because of the noisy children who were running around and playing with son's toys. "He was loud to the point you could say he was screaming."

*Court's Ruling*

Although none of the parties contested son's adoptability, the court independently found by clear and convincing evidence that son was adoptable. The court proceeded to determine whether an exception applied. The court first rejected the notion that mother's relationship with son precluded the termination of parental rights.

Turning to father, the court found "the father has regularly and consistently visited the child and has interacted appropriately with the child . . . ." "[T]he court will note that father is devoted to the child and unfortunately father has not progressed past monitored visitation and there has been . . . an associated limitation of the interaction of the child with father and . . . the court cannot find that the nature of the relationship measured from [son's] point of view is such as to make guardianship an appropriate

7

alternative to the adoption."  Accordingly, the court terminated the parents' parental rights and established adoption as the permanent plan for son.

## DISCUSSION

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child.  Where there is no probability of reunification with a parent, adoption is the preferred permanent plan.  [Citation.]  To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the minor is likely to be adopted if parental rights are terminated.  [Citation.]  Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions [citation], the juvenile court 'shall terminate parental rights' [citation]."  (*In re K.P.* (2012) 203 Cal.App.4th 614, 620; see also Cal. Rules of Court, rule 5.725.)

Father does not contest the court's finding that son will likely be adopted.  Instead, he claims the benefit exception applies.

"Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' [citation] because '[t]he parents have maintained regular visitation and contract with the child and the child would benefit from continuing the relationship.'  [Citation.]  The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'  [Citations.]  No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.'  [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically

8

aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.]  Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'"  (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

"The factors to be considered when looking for whether a relationship is important and beneficial are:  (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)  "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."  (*Id*. at p. 466.)  But "'[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'"  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424.)

Both the substantial evidence and abuse of discretion standards of review "come into play in evaluating a challenge to a juvenile court's determination as to whether the parental . . . relationship exception to adoption applies in a particular case." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  The existence or nonexistence of a beneficial relationship between father and son is a factual issue, subject to the substantial evidence standard of review.  (*Ibid*.)  On the other hand, whether a parental relationship is important enough such that the termination of parental rights would be detrimental to the child is a "'quintessentially' discretionary decision," subject to the abuse of discretion standard of review.  (*Id*. at p. 1315.)

9

Here, the court essentially found some benefit to son accruing from his relationship with father, a conclusion supported by substantial evidence. But the court also concluded this relationship was not important enough to outweigh son's interest in the permanency that would be provided by a plan of adoption. Son was only four years old at the time of the hearing and had not been in father's physical custody for more than two years. Father's visitation, while consistent and pleasant for son, only occurred twice per week and was never unmonitored. Son was generally capable of forming close relationships with others and had in fact formed a meaningful family relationship with his prospective adoptive parents during the dependency. There is no evidence son would be greatly harmed by severing his parental relationship with father; evidence that son had some difficulty parting from father after their visits does not sufficiently demonstrate son needed father as a parent. Son stood to gain the stability of adoption at a relatively young age, as opposed to an indefinite and lengthy foster care status. The positive interactions father and son shared during monitored visitation, as well as father's sincere and passionate love for his son, certainly made this a difficult decision for the court. But we find no grounds for concluding the court abused its discretion by making the decision it did. (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622 [upholding determination that "bond or relationship . . . was qualitatively insufficient to constitute a compelling reason" to maintain parental rights].)

Father relies on several cases in which appellate courts reversed orders forgoing application of the benefit exception. (See *In re Scott B.* (2010) 188 Cal.App.4th 452; *In re S.B.* (2008) 164 Cal.App.4th 289; *In re Amber M.* (2002) 103 Cal.App.4th 681.) *Amber M.* hinged on strong evidence (including expert psychological opinion based on a bonding study) that the three dependent children would be harmed by ending their relationship with mother, as well as the absence of any pertinent evidence supporting the social worker's contrary opinion. (*In re Amber M.*, at pp. 689-690.) Likewise, the evidence relied on by the *S.B.* court to reverse the juvenile court was

10

bolstered by the results of a bonding study performed by an expert witness (*In re S.B.*, at p. 295), the conclusion of which was that "because the bond between [father and daughter] was fairly strong, there was a potential for harm to [daughter] were she to lose the parent-child relationship." (*Id.* at p. 296.) The child in *Scott B.* was 11 years old and had spent nearly all his life living with his mother before the dependency. (*In re Scott B.*, at p. 471.) It was clear the child's "emotional makeup will not enable him to endure interruption of his long-standing frequent visits with" his mother. (*Ibid.*)

None of these cases compels a reversal here. Each dependency case "must be viewed in light of its particular facts." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) No case "stand[s] for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*Ibid.*) Father can point to some similarities between the instant case and past cases resulting in reversals. But unlike cases in which reversal occurred, father cannot identify specific evidence in the record demonstrating the harm to son that could result from the court's order. Instead, father can only return to his consistent (but limited) visitation, son's expressed fondness for father at those visitations, and more general sentimental considerations (e.g., the natural relationship between a father and a son, father's sincere love for son). This record does not compel reversal.[3]

---

[3] We decline father's invitation to establish a bright-line rule in this area of law (or a presumption that the benefit exception applies if certain factual predicates are proven by the parent).

DISPOSITION

The postjudgment order is affirmed.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

12